**U.S. Department of Justice**

*United States Attorney*
*District of Connecticut*

| | |
|---|---|
| Abraham A. Ribicoff Federal Building | (860) 947-1101 |
| 450 Main Street, Room 328 | |
| Hartford, Connecticut 06103 | Fax (860) 240-3291 |

April 19, 2010

United States District Court
District of Connecticut
FILED AT    NEW HAVEN
April 19, 2010
Roberta D. Tabora, Clerk
By P. A. Villano
Deputy Clerk

Gary D. Weinberger, Esq.
Office of the Federal Public Defender
10 Columbus Blvd, Floor 6
Hartford, CT 06106-1976

Re:    <u>United States v. Michael L. Millman</u>
       Criminal No. 3:10CR86(PCD)

Dear Mr. Weinberger:

This letter confirms the plea agreement between your client, Michael L. Millman (the "defendant"), and the United States Attorney's Office for the District of Connecticut (the "Government" or "this Office") concerning the referenced criminal matter.

## THE PLEA AND OFFENSE

The defendant, Michael L. Millman, agrees to waive his right to be indicted and to plead guilty to each count of a four-count information charging him with one count of Bank Fraud, in violation of 18 U.S.C. § 1344, two counts of Wire Fraud, in violation of Title 18 U.S.C. § 1343, and one count of Embezzlement and Theft From an Employee Pension or Welfare Benefit Plan or a Fund Connected With Such Plan, in violation of 18 U.S.C. § 664.

The defendant understands that to be guilty of Count One, Bank Fraud, in violation of 18 U.S.C. § 1344, the following essential elements of the offense must be satisfied:

1. The defendant knowingly executed a scheme or artifice to defraud a financial institution and obtain money and funds under its custody and control by means of material false and fraudulent pretenses, representations, and promises;

2. The defendant did so with the intent to defraud that financial institution; and

3. The financial institution was then insured by the Federal Deposit Insurance Corporation.

The defendant further understands that to be guilty of Counts Two and Three, Wire Fraud, in violation of 18 U.S.C. § 1343, the following essential elements must be satisfied:

1. The defendant participated in a scheme or artifice to defraud or to obtain money or property by means of false and fraudulent pretenses or representations;

2. The defendant did so with the specific intent to defraud; and

3. In furtherance of the scheme to defraud, the defendant used or caused to be used interstate wires.

The defendant further understands that to be guilty of Count Four, Embezzlement and Theft From an Employee Pension or Welfare Benefit Plan or a Fund Connected With Such Plan, in violation of 18 U.S.C. § 664, the following essential elements must be satisfied:

1. The defendant embezzled or stole or abstracted or converted to his own use or the use of a third party the moneys or funds or securities or premiums or credits or property or other assets of an employee benefit plan or of a fund connected with such plan;

2. The employee benefit plan was an employee pension benefit plan or an employee welfare benefit plan subject to Title I of the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. §§ 1001-1191c, and

3. The defendant's unauthorized taking of such property was unlawfully and willfully done either with a fraudulent intent to deprive the plan (or connected fund) of its property with consciousness of wrongdoing, or with reckless disregard of the interests of the plan.

## THE PENALTIES

The defendant's conviction on Count One, Bank Fraud in violation of 18 U.S.C. § 1344, carries a maximum penalty of 30 years imprisonment and a $1,000,000 fine. In addition, under 18 U.S.C. § 3583, the Court may impose a term of supervised release of not more than 5 years to begin at the expiration of any term of imprisonment. The defendant understands that, should he violate any condition of the supervised release, he may be required to serve a further term of imprisonment of up to 3 years with no credit for time already spent on supervised release.

The defendant's convictions on Counts Two and Three, Wire Fraud, in violation of 18 U.S.C. § 1343, each carry a maximum penalty of 20 years imprisonment and a $250,000 fine. In addition, under 18 U.S.C. § 3583, the Court may impose a term of supervised release of not more than 3 years on each count, to begin at the expiration of any term of imprisonment. The

defendant understands that, should he violate any condition of the supervised release, he may be required to serve a further term of imprisonment of up to 2 years with no credit for time already spent on supervised release.

The defendant's conviction on Count Four, Embezzlement and Theft From an Employee Pension or Welfare Benefit Plan or a Fund Connected With Such Plan, in violation of 18 U.S.C. § 664, carries a maximum penalty of 5 years imprisonment and a $250,000 fine. In addition, under 18 U.S.C. § 3583, the Court may impose a term of supervised release of not more than 3 years to begin at the expiration of any term of imprisonment. The defendant understands that, should he violate any condition of the supervised release, he may be required to serve a further term of imprisonment of up to 2 years with no credit for time already spent on supervised release.

The defendant also is subject to the alternative fine provision of 18 U.S.C. § 3571. Under this section, the maximum fine that may be imposed on the defendant is the greatest of the following amounts: (1) twice the gross gain to the defendant resulting from the offense; (2) twice the gross loss resulting from the offense; (3) $250,000; or (4) the amount specified in the section defining the offense which, in the case of Bank Fraud, is $1,000,000.

In addition, the defendant is obligated by 18 U.S.C. § 3013 to pay a special assessment of $100 on each count of conviction, which in this case is $400. The defendant agrees to pay the special assessment to the Clerk of the Court on the day the guilty pleas are accepted.

The defendant is also subject to restitution, as discussed below. Unless otherwise ordered, should the Court impose a fine or restitution of more than $2,500 as part of the sentence, interest will be charged on the unpaid balance of the fine or restitution not paid within 15 days after the judgment date. 18 U.S.C. § 3612(f). Other penalties and fines may be assessed on the unpaid balance of a fine or restitution pursuant to 18 U.S.C. § 3572 (h), (i) and § 3612(g).

Finally, in addition to the standard conditions of any supervised release, the defendant does not object to the Court ordering certain additional conditions, as set forth in the attached Rider: Additional Conditions of Supervised Release.

Restitution

In addition to the other penalties provided by law, pursuant to 18 U.S.C. §3663A, the Court must order that the defendant make restitution to victims of the offenses to which he is pleading guilty. The scope and effect of the order of restitution are set forth in the attached Rider Concerning Restitution. In addition, the defendant agrees to make restitution in an amount to be determined by the Court to all victims of his criminal conduct and not merely for those victims included in the counts to which he agrees to plead guilty.

Regardless of restitution that may be ordered by the Court noted above, the defendant

agrees to make restitution in the amount of at least $975,409.95. While the parties agree that restitution may be paid over the duration of any period of supervised release imposed by the Court, the defendant is aware that, by statute, restitution is payable immediately unless ordered by the Court. The defendant understands that if he fails to make such agreed-upon restitution that the government may seek to void this agreement. The defendant also understand that any restitution imposed by the Court may not be discharged in whole or in part in any present or future bankruptcy proceeding.

### Employment Disability

The defendant hereby acknowledges that conviction of the crime of Embezzlement and Theft From an Employee Pension or Welfare Benefit Plan or a Fund Connected With Such Plan, in violation of 18 U.S.C. § 664, described in this agreement, disqualifies him by operation of law from serving in the capacities described in Section 411 of ERISA, 29 U.S.C. § 1111. Such disqualification includes employment with, or service as a consultant or advisor to, employee benefit plans subject to Title I of ERISA, for a period that extends until 13 years after the date of the sentence or after the end of any imprisonment resulting from conviction of the crimes described in this agreement, whichever is later.

The defendant understands that any relief from the employment disability under ERISA Section 411 will require his demonstration to the sentencing court that he has been rehabilitated and can be trusted to be employed in a prohibited capacity. The Government makes no undertaking that it will support such an application for relief, or that it will recommend that the United States Department of Labor support such application for relief. The Government reserves its right to evaluate such an application at the time it is made and make a recommendation to the Court at that time.

## THE SENTENCING GUIDELINES

### Applicability

The defendant understands that the Court is required to consider any applicable Sentencing Guidelines as well as other factors enumerated in 18 U.S.C. § 3553(a) to tailor an appropriate sentence in this case and is not bound by this plea agreement. The defendant agrees that the Sentencing Guideline determinations will be made by the Court, by a preponderance of the evidence, based upon input from the defendant, the Government, and the United States Probation Office. The defendant further understands that he has no right to withdraw his guilty plea if his sentence or the Guideline application is other than he anticipated, including if the sentence is outside any of the ranges set forth in this agreement.

### Acceptance of Responsibility

At this time, the Government agrees to recommend that the Court reduce by two levels

the defendant's adjusted offense level under § 3E1.1(a) of the Sentencing Guidelines, based on the defendant's prompt recognition and affirmative acceptance of personal responsibility for the offense. Moreover, the Government intends to file a motion with the Court pursuant to § 3E1.1(b) recommending that the Court reduce defendant's adjusted offense level by one additional level based on the defendant's prompt notification of his intention to enter his pleas of guilty.

The above-listed recommendations are conditioned upon the defendant's full, complete, and truthful disclosure to the Probation Office of information requested, of the circumstances surrounding his commission of the offense, of his criminal history, and of his financial condition through the submission of a complete and truthful financial statement. In addition, the recommendations are conditioned upon the defendant timely providing complete information to the Government concerning his involvement in the offenses to which he is pleading guilty. The defendant understands that the Court is not obligated to accept the Government's recommendations on the reductions.

The Government will not make the recommendations if the defendant engages in any acts which, in the Government's view, (1) indicate that the defendant has not terminated or withdrawn from criminal conduct or associations (Sentencing Guideline § 3E1.1); (2) could provide a basis for an adjustment for obstructing or impeding the administration of justice (Sentencing Guideline § 3C1.1); or (3) constitute a violation of any condition of release. Moreover, the Government will not make the recommendations if the defendant seeks to withdraw his plea of guilty or takes a position at sentencing, or otherwise, which, in the Government's assessment, is inconsistent with affirmative acceptance of personal responsibility. The defendant understands that he may not withdraw his pleas of guilty if, for the reasons explained above, the Government does not make one or both of the recommendations.

<u>Stipulation</u>

Pursuant to § 6B1.4 of the Sentencing Guidelines, the defendant and the Government have entered into a stipulation, which is attached to and made a part of this plea agreement. The defendant understands that this stipulation does not set forth all of the relevant conduct and characteristics that may be considered by the Court for purposes of sentencing. The defendant understands that this stipulation is not binding on the Court. The defendant also understands that the Government and the United States Probation Office are obligated to advise the Court of any additional relevant facts that subsequently come to their attention.

<u>Guideline Stipulation</u>

The parties agree as follows:

The Guidelines Manual in effect on the date of sentencing is used to determine the applicable Guidelines range.

The defendant's convictions on each count of the Information are grouped according to U.S.S.G. §3D1.2(d).

The defendant's base offense level under U.S.S.G. § 2B1.1 is 7. That level is increased by 16 levels because defendant caused or intended to cause more than $1,000,000 in loss to his victims. U.S.S.G. § 2B1.1(b)(1)(I). The level is further increased by 2 because the offense involved 10 or more victims. U.S.S.G. § 2B1.1(b)(2)(A)(i). The level is further increased by 2 because the offense involved sophisticated means. U.S.S.G. §2B1.1(b)(9)(C). The level is further increased by 2 because the defendant abused a position of trust. U.S.S.G. §3B1.3. 3 levels are subtracted under U.S.S.G. § 3E1.1 for acceptance of responsibility, as noted above, resulting in a total offense level of 26.

Based on an initial assessment, the parties agree that the defendant falls within Criminal History Category I. The parties reserve the right to recalculate the defendant's Criminal History Category and corresponding sentencing ranges if this initial assessment proves inaccurate.

A total offense level 26, assuming a Criminal History Category I, would result in a range of 63 to 78 months of imprisonment (sentencing table) and a fine range of $12,500 to $125,000, U.S.S.G. § 5E1.2(c)(3). The defendant is also subject to a supervised release term of 3 years to 5 years. U.S.S.G. § 5D1.2.

The defendant expressly understands that the Court is not bound by this agreement on the Guideline ranges specified above. The defendant further understands that he will not be permitted to withdraw his pleas of guilty if the Court imposes a sentence outside any of the ranges set forth in this agreement.

In the event the Probation Office or the Court contemplates any sentencing calculations different from those stipulated by the parties, the parties reserve the right to respond to any inquiries and make appropriate legal arguments regarding the proposed alternate calculations. Moreover, the Government expressly reserves the right to defend any sentencing determination, even if it differs from that stipulated by the parties, in any post-sentencing proceeding.

### Waiver of Right to Appeal or Collaterally Attack Conviction and Sentence

The defendant acknowledges that under certain circumstances he is entitled to challenge his conviction and sentence. The defendant agrees not to appeal or collaterally attack in any proceeding, including but not limited to a motion under 28 U.S.C. § 2255 and/or § 2241, the conviction or sentence imposed by the Court if that sentence does not exceed 63 months, a 5-year term of supervised release, and $975,409.95 in restitution, even if the Court imposes such a sentence based on an analysis different from that specified above. The Government will not appeal a sentence imposed within the stipulated sentencing range. The Government and the defendant agree not to appeal or collaterally attack the Court's imposition of a sentence of imprisonment concurrently or consecutively, in whole or in part, with any other sentence. The

defendant acknowledges that he is knowingly and intelligently waiving these rights. Furthermore, the parties agree that any challenge to the defendant's sentence that is not foreclosed by this provision will be limited to that portion of the sentencing calculation that is inconsistent with (or not addressed by) this waiver.

### Information to the Court

The Government reserves its right to address the Court with respect to an appropriate sentence to be imposed in this case. Moreover, the Government will discuss the facts of this case, including information regarding the defendant's background and character, 18 U.S.C. § 3661, with the United States Probation Office and will provide the Probation Officer with access to material in its file, with the exception of grand jury material.

## **WAIVER OF RIGHTS**

### Waiver of Right to Indictment

The defendant understands that he has the right to have the facts of this case presented to a federal grand jury, consisting of between sixteen and twenty-three citizens, twelve of whom would have to find probable cause to believe that he committed the offense set forth in the information before an indictment could be returned. The defendant acknowledges that he is knowingly and intelligently waiving his right to be indicted.

### Waiver of Trial Rights and Consequences of Guilty Plea

The defendant understands that he has the right to be represented by an attorney at every stage of the proceeding and, if necessary, one will be appointed to represent him.

The defendant understands that he has the right to plead not guilty or to persist in that plea if it has already been made, the right to a public trial, the right to be tried by a jury with the assistance of counsel, the right to confront and cross-examine the witnesses against him, the right not to be compelled to incriminate himself, and the right to compulsory process for the attendance of witnesses to testify in his defense. The defendant understands that by pleading guilty he waives and gives up those rights and that, if the pleas of guilty are accepted by the Court, there will not be a further trial of any kind.

The defendant understands that, if he pleads guilty, the Court may ask him questions about each offense to which he pleads guilty, and if he answers those questions falsely under oath, on the record, and in the presence of counsel, his answers may later be used against him in a prosecution for perjury or making false statements.

<u>Waiver of Statute of Limitations</u>

The defendant agrees that, should the conviction following defendant's pleas of guilty pursuant to this plea agreement be vacated for any reason, then any prosecution that is not time-barred by the applicable statute of limitations on the date of the signing of this plea agreement (including any indictment or counts the Government has agreed to dismiss at sentencing pursuant to this plea agreement) may be commenced or reinstated against defendant, notwithstanding the expiration of the statute of limitations between the signing of this plea agreement and the commencement or reinstatement of such prosecution. The defendant agrees to waive all defenses based on the statute of limitations with respect to any prosecution that is not time-barred on the date the plea agreement is signed.

<u>Waiver of Right To Post-Conviction DNA Testing of Physical Evidence</u>

The defendant understands that the Government has various items of physical evidence in its possession in connection with this case that could be subjected to DNA testing. The defendant further understands that, following conviction in this case, he could file a motion with the Court to require DNA testing of physical evidence pursuant to 18 U.S.C. § 3600 and § 3600A in an attempt to prove his innocence. The defendant understands his right to have all the physical evidence in this case tested for DNA, has discussed this right with his counsel, and knowingly and voluntarily waives his right to have such DNA testing performed on the physical evidence in this case. Defendant understands that, because he is waiving this right, the physical evidence in this case will likely be destroyed or will otherwise be unavailable for DNA testing in the future.

**ACKNOWLEDGMENT OF GUILT AND VOLUNTARINESS OF PLEA**

The defendant acknowledges that he is entering into this agreement and is pleading guilty freely and voluntarily because he is guilty. The defendant further acknowledges that he is entering into this agreement without reliance upon any discussions between the Government and him (other than those described in the plea agreement letter), without promise of benefit of any kind (other than the concessions contained in the plea agreement letter), and without threats, force, intimidation, or coercion of any kind. The defendant further acknowledges his understanding of the nature of the offense to which he is pleading guilty, including the penalties provided by law. The defendant also acknowledges his complete satisfaction with the representation and advice received from his undersigned attorney. The defendant and his undersigned counsel are unaware of any conflict of interest concerning counsel's representation of the defendant in the case.

**SCOPE OF THE AGREEMENT**

The defendant acknowledges that this agreement is limited to the undersigned parties and cannot bind any other federal authority, or any state or local authority. The defendant acknowledges that no representations have been made to him with respect to any civil or

administrative consequences that may result from his pleas of guilty because such matters are solely within the province and discretion of the specific administrative or governmental entity involved. Finally, the defendant acknowledges that this agreement has been reached without regard to any civil tax matters that may be pending or which may arise involving him.

## COLLATERAL CONSEQUENCES

The defendant further understands that he will be adjudicated guilty of each offense to which he has pleaded guilty and will be deprived of certain rights, such as the right to vote, to hold public office, to serve on a jury, or to possess firearms. The defendant understands that pursuant to section 203(b) of the Justice For All Act, the Bureau of Prisons or the Probation Office will collect a DNA sample from the defendant for analysis and indexing. The defendant understands that the Government reserves the right to notify any state or federal agency by which he is licensed, or with which he does business, as well as any current or future employer of the fact of his conviction. Finally, defendant further understands that his conviction of the offenses described in this agreement and the information filed in this case may cause state, local, or other federal agencies or governments to limit or prohibit defendant's acting as an agent in the sale insurance products.

## SATISFACTION OF FEDERAL CRIMINAL LIABILITY; BREACH

The defendant's guilty pleas, if accepted by the Court, will satisfy the federal criminal liability of the defendant in the District of Connecticut as a result of the conduct that forms the basis of the information in this case.

The defendant understands that if, before sentencing, he violates any term or condition of this agreement, engages in any criminal activity, or fails to appear for sentencing, the Government may void all or part of this agreement. If the agreement is voided in whole or in part, defendant will not be permitted to withdraw his pleas of guilty.

**NO OTHER PROMISES**

The defendant acknowledges that no other promises, agreements, or conditions have been entered into other than those set forth in this plea agreement, and none will be entered into unless set forth in writing, signed by all the parties.

This letter shall be presented to the Court, in open court, and filed in this case.

Very truly yours,

NORA R. DANNEHY
UNITED STATES ATTORNEY


_____
DAVID E. NOVICK
ASSISTANT UNITED STATES ATTORNEY

The defendant certifies that he has read this plea agreement letter and its attachment(s) or has had it read or translated to him, that he has had ample time to discuss this agreement and its attachment(s) with counsel and that he fully understands and accepts its terms.

_____       04·19·2010
MICHAEL L. MILLMAN                Date
The Defendant

I have thoroughly read, reviewed and explained this plea agreement and its attachment(s) to my client who advises me that he understands and accepts its terms.

_____       4/19/10
GARY D. WEINBERGER, ESQ.          Date
Attorney for the Defendant

## STIPULATION OF OFFENSE CONDUCT

The defendant Michael L. Millman ("defendant") and the Government stipulate to the following offense conduct that gives rise to the defendant's agreement to plead guilty to the information:

Between in or about June 2005 and in or about December 2009, the defendant: (1) did embezzle, steal, and unlawfully and wilfully abstract and convert to his own use, in the approximate amount of $655,893.55, the moneys, funds, securities, premiums, credits, property and other assets of the Nutmeg Welfare Benefit Plan (the "Plan"), an employee pension benefit plan subject to Title I of ERISA, and of the Nutmeg Welfare Benefit Trust (the "Trust"), a fund connected with such plan; (2) devised and executed a scheme to defraud participants in the Plan and Trust and their agents, and in doing so utilized interstate wires; and (3) devised and executed a scheme to defraud Essex Savings Bank, the then trustee of the Plan and Trust, of $344,516.40. In total, as a result of his criminal conduct described herein, the defendant caused a loss of $1,000,409.95 to his victims. Of that loss, $25,000 has been repaid, resulting in a total of $975,409.95 in restitution due and owing to his victims, as detailed herein.

**Background**

The U.S. Department of Labor ("DOL"), through the Employee Benefits Security Administration ("EBSA") is responsible for the administration and enforcement of the provisions of Title I of the Employee Retirement Income Security Act (ERISA). ERISA regulates, among other programs, employee welfare benefit plans, as defined in 29 U.S.C. § 1002(1). ERISA also prescribes standards of fiduciary conduct that apply to persons responsible for the administration and management of plan assets. An employee welfare benefit plan, as it applies to the subject of this case, is defined in ERISA in part as "any plan, fund, or program...established by an employer...for the purpose of providing for its participants or their beneficiaries, through the purchase of insurance or otherwise, disability [or] death...benefits."

Typically, under ERISA and as it applies to this case, a single employee welfare benefit plan is comprised of a single employer that purchases life and disability insurance for the benefit of individual employees. The individual employee is then entitled to name one or more beneficiaries for any death benefit provided. ERISA also regulates in certain circumstances Multiple Employer Welfare Arrangements ("MEWA"). A MEWA is an employee welfare benefit plan or other arrangement that is designed to provide benefits to the employees of two or more employers. An adopting employer then may purchase insurance through the MEWA for the benefit of that employer's employees and their beneficiaries, while the MEWA sponsor or promoter may manage or administer the actual plan on behalf of the adopting employers.

In or about February 2005, the defendant registered with the State of Connecticut a new organization, Nutmeg Benefit Group, LLC ("NBG"), with defendant as manager and one of three members. In April 2005, the defendant, acting through NBG, established the Nutmeg Welfare

Benefit Plan (the "Plan"). The Plan provides death and disability benefits to employees of employers who adopt the Plan. Plan benefits are provided through the Nutmeg Benefit Trust which is also known as the Nutmeg Welfare Benefit Trust (collectively the "Trust"). The Trust was also established in April 2005. The Plan is a MEWA and is subject to the provisions of Title I of ERISA. NBG is the plan sponsor and administrator.

According to Plan documents, an employer may participate in the Plan by executing an Adoption Agreement with NBG. A participating employer is entitled to provide a death benefit for selected individual employees. The death benefit is obtained through the purchase of an insurance policy by the trust in the name of the designated employee, and the employee may then name the beneficiary of the death benefit. The premiums for each insurance policy were paid by the employer to the Trust. Contributions made by adopting employers were supposed to be deposited into an account held in the name of the Trust, which then was supposed to forward payment to the insurance company. In addition to pre-retirement death benefit, the designated employee is also entitled to a disability benefit. According to the Plan Document, the disability benefit is paid by withdrawing or borrowing from the cash surrender value of the employee's insurance contract. Also upon execution of an Adoption Agreement, the adopting employer acknowledges that if its eligible employees include individuals who are not owners of the employer or their spouses, by joining the Plan, the Employer is creating an employee welfare benefit plan subject to ERISA. NBG, as plan sponsor, and the designated trustee were entitled to reasonable administrative fees and compensation. Adopting employers agreed to pay an annual fee to cover administrative costs.

The Embezzlement

Between in or about June 2005 and in or about December 2009, the defendant embezzled, stole, and unlawfully and wilfully abstracted and converted to his own use, in the approximate amount of $655,893.55, the moneys, funds, securities, premiums, credits, property and other assets of the Plan and Trust. The defendant did so in three ways: (1) failing to forward premiums paid by adopting employers to the appropriate insurance carrier, and instead diverting those premiums to his own use; (2) taking loans from the insurance policies held in the Trust and diverting the proceeds of those loans for his own use; and (3) diverting to his own use money received by the Trust upon surrender of insurance policies in the Trust.

*1. Diverted Premium Payments*

Between in or about June 2005 and in or about December 2009, the defendant diverted for his own use approximately $307,800.33 in insurance premium payments made by Plan participants and intended for insurance policies of seventeen different individuals held in the Plan and Trust, as follows:

| Date Paid by Participant | Amount from Participant | Policy(ies) | Amount Sent to Insurance Co. | Date Sent | Amount of Theft |
|---|---|---|---|---|---|
| 06/23/05 | $12,500.00 | Meyer | $0.00 | none | $12,500.00 |
| 10/13/05 | 50,000.00 | Abramson | 16,666.66 | 11/14/05 | 33,333.34 |
| 12/29/05 | 200,000.00 | McCarty | 150,000.00 | 5/3/2006-5/9/2006 | 50,000.00 |
| 06/15/06 | 25,000.00 | Gallin[1] | 19,000.00 | 07/10/06 | 6,000.00 |
| 08/01/06 | 25,000.00 | Gallin | 19,000.00 | 08/04/06 | 6,000.00 |
| 08/24/06 | 25,000.00 | Gallin | 19,000.00 | 08/29/06 | 6,000.00 |
| 09/15/06 | 25,000.00 | Gallin | 19,000.00 | 09/19/06 | 6,000.00 |
| 06/24/08 | 221,717.43 | Spialter | 160,000.00 | 06/25/08 | 61,717.00 |
| 02/23/09 | 23,416.67 | Conemaugh[2] | 0.00 | none | 23,416.67 |
| 05/04/09 | 4,916.67 | Conemaugh | 0.00 | none | 4,916.67 |
| 05/22/09 | 833.33 | Conemaugh | 0.00 | none | 833.33 |
| 06/12/09 | 4,916.67 | Conemaugh | 0.00 | none | 4,916.67 |
| 06/18/09 | 833.33 | Conemaugh | 0.00 | none | 833.33 |
| 06/30/09 | 4,916.67 | Conemaugh | 0.00 | none | 4,916.67 |
| 09/14/09 | 4,916.67 | Conemaugh | 0.00 | none | 4,916.67 |
| 10/15/09 | 833.33 | Conemaugh | 0.00 | none | 833.33 |
| 10/15/09 | 4,916.67 | Conemaugh | 0.00 | none | 4,916.67 |
| 11/16/09 | 4,916.67 | Conemaugh | 0.00 | none | 4,916.67 |
| 11/20/09 | 833.33 | Conemaugh | 0.00 | none | 833.33 |
| 11/24/09 | 140,000.00 | McDevitt | 70,000.02 | 12/02/09 | 70,000.02 |
| | | | | **Total Theft:** | **$307,800.33** |

*2. Diverted Loan Proceeds*

On or about March 28, 2008, the defendant terminated the prior trustee of the Trust and appointed Affiliated Financial Partners, LLC ("AFP"), a entity wholly owned and operated by defendant, as trustee. The defendant terminated the prior trustee specifically because that trustee refused to authorize policy loans defendant requested. On or about March 28, 2008, the defendant, acting as trustee, caused an interstate facsimile transmission to be sent to Lincoln National Life Insurance (now Lincoln Financial Group, hereinafter "Lincoln") requesting loans

---

[1] The "Gallin" policies include policies for four different individuals, all employees of John Gallin & Son, Inc.: Christopher Gallin, Michael Gallin, Thomas Gallin, and Mark Varian.

[2] The "Conemaugh" policies include policies for eight different individuals, all employees of Conemaugh Health System and related companies: John Brennan, Paul Raymond, Brian Lieb, Mark Ratchford, Donald Ratchford, Paul Liszewski, Paul Rollins, and Ann Marie Sterlin.

on six insurance policies that were held by the Trust and were part of the Plan. Between April 1 and 8, 2008, the Trust received money from Lincoln in the following amounts, with interest calculated as of February 1, 2010:

| Date | Amt of Loan | Policy | Trust Acct | Proceeds | With Interest (2/1/10) |
|---|---|---|---|---|---|
| 04/01/08 | $60,000.00 | Abramson | NWBT3381 | $60,000.00 | 67,236.45 |
| 04/04/08 | $15,000.00 | C. Gallin | NWBT3381 | $15,000.00 | 16,698.40 |
| 04/04/08 | $15,000.00 | M. Gallin | NWBT3381 | $15,000.00 | 16,698.40 |
| 04/04/08 | $15,000.00 | M. Varian | NWBT3381 | $15,000.00 | 16,726.22 |
| 04/04/08 | $20,000.00 | S. Hendelman | NWBT3381 | $20,000.00 | 22,261.86 |
| 04/08/08 | $20,000.00 | B. Hendelman | NWBT3381 | $20,000.00 | 22,254.51 |
|  |  | **Total Proceeds** |  | **$145,000** |  |
|  |  | **Total Loss:** |  |  | **$161,875.74** |

Of the $145,000 loan proceeds that was sent from Lincoln to the Trust, the defendant (acting as trustee) caused several disbursements to be made from the Trust: approximately $110,000 went to a bank account owned by AFP, $10,000 went to a bank account under the name of Michael L. Millman, LTD ("MLM-LTD"), a company wholly owned by defendant, and $25,000 went to Essex Savings Bank, to repay partially money diverted by the defendant from Essex in November 2007. From there, the defendant diverted the loan proceeds to his own uses. Each loan has accrued interest as stated above, and the value of each policy has thereby been reduced by the original loan principal plus interest, until and unless that total amount is repaid to Lincoln.

*3. Diverted Proceeds from Surrendered Policies*

In or about July 2008, a plan participant directed the defendant to surrender one of his two insurance policies held in the Plan and Trust ("the McCarty policy ending 949"), and to transfer the proceeds to a new insurance company. On July 16, 2008, $141,502.24 was transferred to the Trust from Lincoln as the proceeds of the surrender of the McCarty policy ending 949. On October 1, 2008, the defendant, again acting as Trustee, directed only $3,237.50 to the new insurance company.

In or about September 2008, the same participant directed that his other insurance policy held in the Plan and Trust ("the McCarty policy ending 149") be surrendered and the proceeds forwarded to the new insurance company. On October 2, 2008, $137,952.64 was transferred to the Trust from Lincoln as the proceeds of the surrender of the McCarty policy ending 149. On October 30, 2008, the defendant caused only $90,000 to be sent from the Trust to the new insurance company. From the total proceeds of the surrender of the two McCarty insurance policies, the defendant failed to forward $186,217.38, and diverted those proceeds to his own use.

The Bank Fraud

Between January 1, 2007 and March 4, 2008, Essex Savings Bank ("Essex") served as the trustee of the Trust. As trustee, Essex was responsible for executing the instructions of NBG, the Plan sponsor, and for holding in trust the assets of the Plan, which primarily consisted of insurance policies. The defendant instructed Essex that they were a "directed trustee," and were to follow his instructions without question. Between in or about September 2007 and in or about November 2007, the defendant knowingly devised and executed a scheme and artifice to defraud Essex and to obtain money and funds under its custody and control by means of material false and fraudulent pretenses, representations, and promises.

In or about September 2007, the defendant received a check from Conemaugh Health System, an adopting employer, for the payment of a premium on National Life Insurance Company ("National Life") policy held in the Trust and for the benefit of an employee of Conemaugh (the "Rollins policy"). The defendant presented the check to Essex for deposit into the Trust on September 7, 2007. Shortly thereafter, the defendant caused communications to be sent to Essex directing Essex to pay out $342,500 of the money intended for the Rollins policy premium to different destinations, other than for the premium on the Rollins policy. In late October or early November of 2007, NBG advised Essex that a $350,000 payment had come due for the Rollins policy, and Essex requested additional funds from NBG in order to make that payment. At that time, the Trust cash balance was $7,500.

At that time, there existed two bank accounts at Wachovia Bank in the name of the Trust, which had been the primary Trust accounts when the defendant himself was the trustee. The defendant had sole access to those Wachovia accounts. On or about November 2, 2007, the defendant caused a check to be sent from one of the Wachovia accounts ("Wachovia trust account ending 394") in the amount of $345,000 to Essex in order to cover the Rollins policy premium. The defendant caused an email to be sent to Essex by Maribeth Lawrence ("Lawrence"), the Director of Operations of NBG, to Essex, stating that a check was being sent by Federal Express from NBG to Essex in the amount of $345,000 to be deposited into the Trust account. Lawrence then sent a second email requesting that Essex send $350,000 to JP Morgan Chase Bank to cover the Rollins premium payment.

On November 5, 2007, Essex received the $345,000 check from the Wachovia Trust account ending 394, and deposited it into the Trust account at Essex. The check was dated November 2, 2007 and signed by the defendant. On or about November 6, 2007, Essex made the $350,000 payment by wire to JP Morgan Chase Bank for the Rollins policy premium payment. On or about November 8, 2007, the $345,000 check from the Wachovia Trust account ending 394 was returned for insufficient funds. As of November 2, 2007, the Wachovia Trust account ending 394 had a balance of $100.00.

On or about November 7, 2007, the defendant caused an email to be sent to Essex stating that the $345,000 check was drawn on the wrong account and a replacement check would be

sent. On or about November 13, 2007, Essex received a second check for $345,000 from the second Trust account at Wachovia ("Wachovia trust account ending 381"). The check was dated November 9, 2007 and signed by the defendant. On or about November 16, 2007, that check was also returned for insufficient funds. As of November 9, 2007, the Wachovia Trust account ending 381 had a balance of $300.33.

On or about November 29, 2007, the defendant directed Essex to execute a loan from the cash value of the Rollins policy in the amount of $345,000, with the proceeds to be forward to Essex to make up for the amount diverted by the defendant. Essex executed the loan documents, and then again executed amended loan documents on December 3, 2007, at the defendant's direction, altering the loan amount to $350,000. Following the disbursement of funds to Essex, Essex determined that the transaction was prohibited by ERISA. They then returned the loan proceeds to National Life on January 4, 2008, along with interest of $2,016.40, for a total of $352,016.40. Also on January 4, 2008, the defendant wrote a check in the amount of $352,016.40 from an AFP account, which defendant indicated would repay the loan. National returned the check because they had already received funds from Essex and the Trust. However, on the date that the defendant wrote the AFP check, the AFP account had a negative balance. The defendant repaid only $25,000 of the loss to Essex, on April 11, 2008, from the proceeds of the policy loans discussed in the prior section.

In total, the defendant caused a loss to Essex of $344,516.40, which includes the $345,000 bounced check, less the $2,500 that was in the Essex Trust account at time Essex was removed as trustee, plus $2,016.40 in interest paid by Essex to National as described above. For purposes of restitution, the defendant will be given credit for the $25,000 that was returned to Essex on April 11, 2008.

The Fraudulent Documents (Wire Fraud)

Between in or about June 2005 and in or about December 2009, the defendant intentionally devised and intended to devise, and participated in, a scheme and artifice to defraud individuals out of money, and to obtain money by means of materially false and fraudulent pretenses, representations, promises and omissions, in that the defendant did embezzle, steal, and unlawfully and wilfully abstract and convert to his own use, the moneys, funds, securities, premiums, credits, property and other assets of the Plan, Trust, and trustee, and intentionally misrepresented the financial position of insurance policies within the Plan and Trust so as both to avoid detection by Plan participants and/or agents thereof and to permit the participants to continue to contribute premiums to the Plan and Trust.

*The Abramson Policy Forged Document*

On or about October 13, 2005, the defendant, acting as managing member of NBG and trustee of the Trust, received a check from an adopting employer in the amount of $50,000 to pay the premium for a Lincoln insurance policy within the Plan and Trust (the "Abramson Policy").

On or about November 14, 2005, the defendant caused a wire to be sent from NBG to Lincoln in the amount of $16,666.66 for payment of the premium on the Abramson policy. The defendant did not, nor has he or NBG or the Trust, paid the remaining $33,333.34 of that premium for the Abramson policy.

In or about October 9, 2007, the defendant, for the purpose of executing the scheme and artifice to defraud, caused to be transmitted an interstate wire communication, that is a facsimile transmission from NBG offices in Fairfield, Connecticut to Ronald Rubin ("Rubin"), agent for the Abramson policy, in New York City, New York ("the Abramson fax"). The Abramson fax was a falsified annual report of the Abramson policy that purported to show a total account value for the Abramson policy as if the entire $50,000 premium had been forwarded to Lincoln, thereby hiding from Abramson and his agent that the defendant had converted $33,333.34 of Abramson's money for the defendant's own use. Unaware of the defendant's theft, Abramson continued to participate in the Plan and Trust following the theft.

*The Hendelman Forged Documents*

As noted above, on April 4, 2008, and April 8, 2008, respectively, the defendant, acting as trustee, caused $20,000 loans to be taken on each of the policies owned by Brandyce Hendelman and Sean Hendelman, for a total of $40,000 in loans. The defendant then diverted the proceeds from those loans to his own use.

As part of his scheme to defraud the participants of the Plan and Trust, the defendant then caused fraudulent documents to be sent to Ronald Rubin, the agent for the Hendelmans. On or about May 13, 2008, the defendant caused an interstate wire communication to be sent, that is an email communication from NBG email servers in Fairfield, Connecticut, to Rubin in New York City, New York (the "Hendelman email"). In the Hendelman email, the defendant advised that the Hendelmans should keep their policies in force until January 2009. Attached to the email were two documents, that purported to be account information printouts concerning the insurance policies of Brandyce Hendelman and Sean Hendelman, respectively, as of May 13, 2008. Both of those account information printouts were false and fraudulent, in that each indicated that no loans had been taken on the Hendelman insurance policies, whereas, as the defendant well knew, the defendant had taken loans on those policies the prior month. As a result of the Hendelman email, the Hendelmans and their agent were unaware of the defendant's loans, and therefore continued to participate in the Plan and Trust and, moreover, did not contest the loans taken on their policies, including the defendant's diversion of the loan proceeds to his own ends.

*The Gallin/Varian Forged Documents*

As noted above, on April 4, 2008, the defendant, acting as trustee, caused loans to be taken on policies held within the Plan and Trust as follows: $15,000 from a policy in the name of Christopher Gallin; $15,000 from a policy in the name of Mark Varian; and $15,000 from a policy in the name of Michael Gallin. The defendant then diverted the proceeds of those loans to

his own use.

As part of his scheme to defraud the participants of the Plan and Trust, the defendant then caused fraudulent documents to be sent to Ronald Rubin, the agent for Varian and the Gallins. On or about April 21, 2008, the defendant caused an interstate wire communication to be sent, that is a facsimile transmission from NBG offices in Fairfield, Connecticut to Rubin in New York City, New York (the "Gallin fax"). The Gallin fax consisted of fraudulent in-force projections for the policies held by Mark Varian and Christopher and Michael Gallin, which showed that no loans had been taken on any of those insurance policies. Unaware that the defendant had taken loans on their policies and diverted them to his own use, Varian and the Gallins continued to participate in the Plan and Trust and, moreover, did not contest the loans taken on their policies, including the defendant's diversion of the loan proceeds to his own ends.

*The McDevitt Premium Check*

On or about November 11, 2009, a premium payment came due for the life insurance policy of plan participants Pauline and John McDevitt. The total premium due to Lincoln was $140,000.04. On or before November 24, 2009, the McDevitts submitted a check towards their premium for $140,000.00 to the defendant, acting as trustee. On or about December 2, 2009, the defendant forwarded a check in the amount of $70,000.02 to Lincoln for payment of the McDevitt policy premium. The defendant did not forward the remaining $69,999.98 to Lincoln, but instead diverted that money to his own use.

Shortly following December 2, 2009, the agent for the McDevitts, Scott Sullivan, requested proof from the defendant that the premium had been paid. As part of his scheme to defraud the participants of the Plan and Trust, the defendant then sent a fax from his office in Connecticut to Sullivan's office in New Hampshire. The fax contained a copy of a check from the Wachovia Trust account ending 381, written to Lincoln, dated December 2, 2009, in the amount of $140,000.04, which the defendant represented to Sullivan had been sent to Lincoln for payment of the McDevitt premium. In fact, and as the defendant well knew, that check had not been sent to Lincoln, nor had any check been sent by the defendant to Lincoln other than the $70,000.02 check referred to above.

The written stipulation above is incorporated into the preceding plea agreement. The defendant and the Government reserve their right to present additional relevant offense conduct to the attention of the Court in connection with sentencing.

_____
MICHAEL L. MILLMAN
The Defendant

_____
DAVID E. NOVICK
ASSISTANT UNITED STATES ATTORNEY

_____
GARY D. WEINBERGER, ESQ.
Attorney for the Defendant

## RIDER CONCERNING RESTITUTION

The Court shall order that the defendant make restitution under 18 U.S.C. § 3663A. The order of restitution may include:

1. If the offense resulted in damage to or loss or destruction of property of a victim of the offense, the order of restitution shall require the defendant to:

   A. Return the property to the owner of the property or someone designated by the owner; or

   B. If return of the property is impossible, impracticable, or inadequate, pay an amount equal to:

   The greater of -
   (I) the value of the property on the date of the damage, loss, or destruction; or
   (II) the value of the property on the date of sentencing, less the value as of the date the property is returned.

2. In the case of an offense resulting in bodily injury to a victim –

   A. pay an amount equal to the costs of necessary medical and related professional services and devices related to physical, psychiatric, and psychological care; including non-medical care and treatment rendered in accordance with a method of healing recognized by the law of the place of treatment;

   B. pay an amount equal to the cost of necessary physical and occupational therapy and rehabilitation; and

   C. reimburse the victim for income lost by such victim as a result of such offense;

3. In the case of an offense resulting in bodily injury that results in the death of the victim, pay an amount equal to the cost of necessary funeral and related services; and

4. In any case, reimburse the victim for lost income and necessary child care, transportation, and other expenses incurred during participation in the investigation or prosecution of the offense or attendance at proceedings related to the offense.

The order of restitution has the effect of a civil judgment against the defendant. In addition to the court-ordered restitution, the court may order that the conditions of its order of restitution be made a condition of probation or supervised release. Failure to make restitution as ordered may result in a revocation of probation, or a modification of the conditions of supervised release, or in the defendant being held in contempt under 18 U.S.C. § 3583(e) Failure to pay restitution may also result in the defendant's re-sentencing to any sentence which might originally have been imposed by the Court. See 18 U.S.C. §§ 3614; 3613A. The Court may also order that the defendant give notice to any victim(s) of his offense under 18 U.S.C. § 3555.